**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**NICHOLAS DANIEL FRITSCH,**

**Plaintiff,**

**v.** **Case No. 24-cv-1444**

**JAMES GREEN,**

**Defendant.**

---

**ORDER**

---

Plaintiff Nicholas Daniel Fritsch, who was previously incarcerated and is representing himself, brings this lawsuit under 42 U.S.C. § 1983. Fritsch was allowed to proceed on an Eighth Amendment claim for unconstitutional conditions of confinement because defendant James Green allegedly did not assist him in replacing his Oleoresin Capsicum spray (OC spray) contaminated bed linens. Green filed a motion for summary judgment. (ECF No. 18.) The motion is ready for a decision. For the reasons stated below, the court grants Green's motion for summary judgment.

**PRELIMINARY MATTER**

Green argues that Fritsch failed to follow Federal Rule Civil Procedure 56 and Civil Local Rule 56 when responding to their motion for summary judgment, failing to substantively dispute their proposed findings of fact. (ECF No. 40 at 2-3.) District courts are entitled to construe *pro se* submissions leniently and may overlook a

plaintiff's noncompliance by construing the limited evidence in a light most favorable to the plaintiff. *See Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016). Fritsch's response contains sufficient facts, allowing the court to rule on the defendants' summary judgment motion. Fritsch also invokes 28 U.S.C. § 1746 in his complaint, which is enough to convert the complaint into an affidavit for the purposes of summary judgment. *See Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017); *Owens v. Hinsley*, 635 F.3d 950, 954–55 (7th Cir. 2011). As such, the court will consider the information contained in Fritsch's submissions where appropriate in deciding defendants' motion.

**FACTS**

At all times relevant, Fritsch was incarcerated at Green Bay Correctional Institution (GBCI). (ECF No. 20, ¶ 1.) Green was a Sergeant at GBCI. (*Id.*, ¶ 2.)

On April 11, 2024, at approximately 9:10 a.m., there was a fight between prisoners on Fritsch's housing tier. (ECF No. 20, ¶ 13.) Fritsch was not involved in the fight. (*Id.*, ¶ 14.) Non-defendants Officer Torrez and Officer Duren used OC spray to break up the fight, and residual OC spray may have drafted into Fritsch's cell. (*Id.*, ¶¶ 15-17.)

Later that day at approximately 11:10 a.m., the prisoner in the cell next to Fritsch came into Fritsch's cell and began physically assaulting him. (ECF No. 20, ¶ 18.) Torrez and Duren again used OC spray to break up the fight, which was directed at the prisoners' heads but sprayed in Fritsch's cell. (*Id.*, ¶¶ 19-21.) Once Fritsch and the other prisoner were subdued, Fritsch was placed on Temporary Lock Up (TLU)

and evaluated by the Health Services Unit (HSU). (*Id.*, ¶¶ 22-23.) Fritsch states that this evaluation was "about 30 seconds because my appointment was cut short for a court call." (ECF No. 36, ¶ 23.) Green does not dispute that Fritsch had an attorney call. (ECF No. 20, ¶¶ 23-24.)

Green asserts that after Fritsch's attorney call, he was offered a shower in the bathhouse. (ECF No. 20, ¶ 25.) At that time, Green states that "Fritsch would have had the opportunity to swap all of his bed linen and state issued clothing." (*Id.*) Fritsch disputes this. (ECF No. 36, ¶ 26.) Fritsch states that he was moved to a new cell in a new housing unit, but he was still in clothes covered in OC spray, and he had to bring his bedding, which was also covered in OC spray. (*Id.*, ¶¶ 26-28.)

Green was the sergeant overseeing Fritsch's new housing unit. (ECF No. 20, ¶ 27.) At some point on April 11, 2024, Green asserts that "Fritsch told Sergeant Green, at his cell front, that his sheets were contaminated with OC spray and that he needed new sheets." (*Id.*, ¶¶ 28, 64.) When Green examined Fritsch's cell and bedding he states he "did not smell the odor of OC spray . . . nor did he see the orange-color residue on Fritsch's linen." (*Id.*, ¶ 29.) Despite this, Green states "he reached out to bathhouse staff and requested for Fritsch to swap out his bed linen." (*Id.*, ¶ 30.) According to Green, the bathhouse is responsible for the exchange of clothing and bedding. (*Id.*, ¶ 31.) Bathhouse staff told Green that Fritsch needed to wash his linen in his cell sink. (*Id.*, ¶ 32.) Green informed Fritsch of the bathhouse's response. (*Id.*, ¶ 33.)

Fritsch disputes that Green would have been able to see any OC spray residue, and he also states that Green told him he could smell OC spray. (ECF No. 36, ¶ 29.) Fritsch further doubts that Green called anyone working at the bathhouse, and that bathhouse staff would never recommend that any prisoner wash their linen in the sink. (*Id.*, ¶¶ 30-32.) He notes that the sink is small, like a "bubbler" or water fountain with less than a gallon capacity. (ECF No. 35 at 5-6.) After he asked Green on April 11 for new bedding and clothes, Fritsch states he had to wait eight additional days before he got clean bedding and clothes. (*Id.* at 6.)

Green asserts that according to the laundry policy in the inmate handbook (which Fritsch received a copy of when he entered GBCI), prisoners are required to complete an interview/information request asking for their clothes and/or bedding to be laundered. (ECF No. 20, ¶ 35.) Green states there is no record of Fritsch submitting an interview/information request about his laundry. (*Id.*, ¶ 37.) Green also notes that Fritsch's cell hall had laundry days on Sunday, Monday, and Tuesday, so he would have had an opportunity to send out his clothes and bedding on those days. (*Id.*, ¶¶38-40.)

Fritsch asserts that he wrote the bathhouse about his laundry "daily thru [*sic*] my celly." (ECF No. 35 at 4.) He also states that it would take weeks for the bathhouse to respond to such requests. (*Id.*) Additionally, Fritsch asserts the laundry system at GBCI was slow and laundry would often go missing. (*Id.* at 3.) As such, he states that Green "had a duty to secure me new linen but failed to do so." (*Id.*)

Green asserts that Fritsch never sought medical care for any injuries or issues related to OC spray exposure. (ECF No. 20, ¶¶ 42-61.) Fritsch was first seen by HSU staff at approximately 1:15 p.m. on April 11, 2024, shortly after the assault by the other prisoner. (*Id.*, ¶ 44.) He had been punched in the eye during the altercation and "complained of headache, nausea, eye pain, and 'slowed' thoughts." (*Id.*) His eye was treated and he returned to his cell. (*Id.*) Later that day, at approximately 6:45 p.m., Green called HSU informing then that "Fritsch was complaining about nausea and vomiting and 'seeing color' out of his left eye." (*Id.*, ¶ 45.) HSU staff informed Green that Fritsch had already been examined, and that he was on concussion protocol. (*Id.*)

Between April 12, 2024, and June 10, 2024, Fritsch was examined by HSU staff six times, including receiving two x-rays and an examination by the Ophthalmology department. (ECF No. 20, ¶¶ 47-55.) According to the medical records, Fritsch was treated for injuries related to the fight, including nose bleeds, vomiting, blurry vision, pain in his left eye, face numbness and seeing flashes of color. (*Id.*) The x-rays did not show any acute fractures or abnormalities. (*Id.*) Green notes that "Fritsch never directly complained to HSU regarding ongoing side effects related to the discharge of OC spray in his room on April 11." (*Id.*, ¶ 56.)

Fritsch states that he was suffering from a concussion and the OC spray caused swelling that made his pain worse. (ECF No. 36, ¶ 46.) He also states that he had a broken eye socket. (*Id.*) He believes his eye pain was caused by the OC spray. (*Id.*, ¶ 47.) He further states that he told HSU staff about his contaminated clothing and bedding, but they did not do anything. (*Id.*, ¶ 49.) Sometime after the incident, Fritsch

states he saw an ear, nose, and throat specialist who determined that he had an "orbital floor fracture." (*Id.*, ¶ 51.) He also states that he was diagnosed with asthma some time later. (*Id.*, ¶ 57.) He states his exposure to OC spray caused "shortness of breath, asthma attacks, coughing, and weezing [*sic*]." (ECF No. 35.) However, Fritsch provides no medical records supporting the above-mentioned facts.

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment a party cannot just rely on his

pleadings but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Fritsch claims that Green violated his Eighth Amendment rights when he failed to replace Fritsch's OC spray covered clothing and bedding. "The Eighth Amendment can be violated by conditions of confinement in a jail or prison when (1) there is a deprivation that is, from an objective standpoint, sufficiently serious that it results 'in the denial of the minimal civilized measure of life's necessities' and (2) where prison officials are deliberately indifferent to this state of affairs." *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016). Inmates are entitled to be provided with adequate food, clothing, shelter, bedding, hygiene materials, and sanitation. *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009); *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006). However, "the Constitution does not mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), and inmates cannot expect the "amenities, conveniences, and services of a good hotel." *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988); *see also Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650 (7th Cir. 2012) ("Prison conditions may be harsh and uncomfortable without violating the Eighth Amendment's prohibition against cruel and unusual punishment.").

Fritsch claims that Green violated his Eighth Amendment rights when he did not ensure that Fritsch had clean clothing and bedding after they were contaminated with OC spray, causing him to have OC spray laden linens for eight days. Even if having to use linens contaminated with OC spray would constitute a deprivation of the minimal civilized measure of life's necessities, it is doubtful that the plaintiff was actually forced to endure that scenario. While the court appreciates that the small sink in Fritsch's cell would have made washing his own linens onerous, Fritsch still had the ability to clean his own linens if they were causing him offense. As such, he did not suffer unconstitutional conditions of confinement. *See Myrick v. Anglin*, 496 Fed. App'x 670, 675 (7th Cir. 2012) (determining that a prisoner plaintiff did not demonstrate a conditions of confinement claim where it was undisputed that he could wash his own contaminated clothing). Moreover, the plaintiff has not explained why he could not have simply dispensed with linens altogether for that relatively short period. In other words, sleep on a bare mattress. Courts have held that "requiring an inmate to sleep on a mattress on the floor does not in itself rise to the level of a constitutional violation." *Hines v. Sheahan,* 845 F. Supp. 1265, 1269 (N.D. Ill. 1994); *Johnakin v. NYC Dep't of Corr.,* No. 11-CV-4807 SLT LB, 2013 WL 5519998, at *13 (E.D.N.Y. Sept. 30, 2013) (allegations that DOC failed to provide a pillow and mattress cover are insufficient to state a claim under the Eighth or Fourteenth Amendments.") Moreover, the plaintiff does not allege that he needed the linens to stay warm in an excessively cold cell, and so it appears he could simply have slept on a bare mattress (i.e., without any contaminated linens) for that short period of time.

*Cf. Johnson v. Lappin,* 264 F. App'x 520, 523 (7th Cir. 2008) (plaintiff kept in "frigid dry cell for six days in early March wearing only his underwear and without bedding for warmth, water, or basic hygiene items.") Uncomfortable, yes. Unconstitutional, no.

Fritsch also does not demonstrate that he suffered a significantly serious injury. The Seventh Circuit Court of Appeals has held that a prisoner plaintiff "must do more than demonstrate a triable issue of fact with respect to the condition he faces; he must also show that he suffered some cognizable harm from the [conditions], and that the [defendant's] deliberate indifference caused that harm." *Gray,* 826 F.3d at 1006. "When assessing an Eighth Amendment claim, we look for physical injury 'that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'" *Id.* (quoting *Hayes v. Snyder*, 546 F.3d 516, 523 (7th Cir. 2008)). Fritsch states that he believes that the extended exposure to OC spray worsened the eye injury he sustained in the assault. However, he offers no evidence that this was the case. Nothing in his medical records show that any medical professional acknowledged the impact of the OC spray. Indeed, even though Fritsch was in the HSU several times after April 11, 2024, the medical records show he did not mention any symptoms or issues caused by OC spray. Fritsch also provides evidence that he was later diagnosed with asthma, but he provides no evidence that the asthma was caused by several days' exposure to OC spray. He states he suffered from "shortness of breath, asthma attacks, coughing,

and weezing [*sic*].” (ECF No. 35 at 2) but he has not demonstrated that these symptoms rose to the level of a serious issue requiring medical attention.

Finally, even if Fritsch had demonstrated that he suffered a sufficient deprivation and a tangible injury, he fails to demonstrate that *Green* caused any injury that Fritsch suffered. For a § 1983 claim to survive summary judgment, a plaintiff “must establish not only that a state actor violated his constitutional rights, but also that the violation *caused* the plaintiff injury or damages.” *Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020) (quoting *Elyea*, 631 F.3d at 864) (emphasis in original). It is undisputed that Fritsch asked Green for assistance with his bedding once, on April 11, 2024. Fritsch also asserts that after that, he had his cell mate write the bathhouse asking for new clothes and bedding and that he asked HSU several times to get him new clothes and bedding. (ECF No. 35 at 4; ECF No. 36, ¶ 49.) Thus, it would be the bathhouse staff and the HSU staff who caused Fritsch to live with contaminated linens for several days, not Green.

Because Fritsch does not demonstrate that he suffered a deprivation of the minimal civilized measure of life’s necessities; a significant injury; or that Green caused his injury, summary judgment is granted in favor of Green.

## CONCLUSION

For the foregoing reasons, the court grants Green’s motion for summary judgment. Green also argued that he was entitled to qualified immunity but because the court decided the case in his favor on the merits, it does not have to address that argument. Because there are no remaining claims, the case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motion for summary judgment (ECF No. 18) is **GRANTED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED**. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 5th day of August, 2026.

STEPHEN DRIES
United States Magistrate Judge